UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GAIL SWEENEY, )<br>)<br>PLAINTIFF )<br>)<br>v. )<br>)<br>SANTANDER BANK, N.A., )<br>)<br>DEFENDANT. )<br>) | CIVIL ACTION NO. 1:19-cv-10845-ADB |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Santander Bank, N.A. ("Santander" or the "Bank") provides this memorandum in support of its Motion for Summary Judgment. Plaintiff Gail Sweeney created a hostile work environment by making racist and ethnically offensive comments to her co-workers. Because of this intolerable conduct, Santander terminated Plaintiff's employment.

Plaintiff now alleges that she was discriminated against on the basis of her race (white) or her age. These allegations are unfounded. Plaintiff cannot establish a prima facie case of reverse race discrimination, because there are no background circumstances to suggest that the Bank discriminates against whites. Furthermore, there is no evidence to support any inference that the reason for Plaintiff's termination – her objectionable behavior – was a pretext to mask race or age discrimination. Summary judgment should be granted as to Plaintiff's discrimination claims.

Plaintiff also brings a state-law breach of contract claim for severance. This claim is preempted because Santander's severance plan is governed by ERISA. Furthermore, severance is only provided under that plan if an employee is terminated as part of a workplace reduction, and there is no dispute that did not occur here. Summary judgment should be granted on the contract claim as well.

I.      BACKGROUND

   A.    Plaintiff's Employment with Santander

Santander is a locally-focused bank, and is among the top banks in the United States, with more than 600 branches. Santander's Anti-Discrimination & Harassment Policy, contained in its Team Member Handbook, expresses the Bank's commitment to "a workplace built on mutual respect," "free of any conduct that creates an intimidating, offensive or hostile work environment." Defendant's Statement of Facts ("SOF") ¶ 1. Discrimination or harassment based on any category protected by law is strictly prohibited by the Bank. *Id.* Similarly, the Equal Opportunity, Respectful and Safe Workplace policy in the Bank's Code of Conduct states that Santander is "committed to a safe workplace that values equal opportunity, is free from discrimination and harassment, and does not tolerate inappropriate workplace behavior. You are expected to act professionally and show respect for others, thus fostering a positive, inclusive and productive work environment." SOF ¶ 2. Bank employees "have the responsibility to foster a respectful, inclusive, and productive work environment." *Id.* Examples of unacceptable conduct include threats, derogatory comments, teasing, bullying, intimidation or other offensive action whether related to an individual's membership in a protected class or not. *Id.* Santander encourages its employees to report discrimination or harassment, either to their direct supervisor, to Employee Relations, or to Santander's anonymous hotline. SOF ¶ 3. Retaliation for reporting such issues is also prohibited. *Id*. Plaintiff was familiar with the Anti-Discrimination & Harassment Policy and the Equal Opportunity, Respectful and Safe Workplace policy. SOF ¶ 4.

Plaintiff worked at all relevant times for Santander in the Fraud Department as a fraud analyst. SOF ¶ 5. Plaintiff worked in a call center-type position, and was responsible for communicating with customers about fraud-related issues. SOF ¶ 6. Plaintiff sat with six other co-workers at an open table, such that everyone could see and hear everyone else. SOF ¶ 7.

Plaintiff was supervised by Jose Claudio, who reported to Kim Williams; Ms. Williams reported to Director of Fraud Operations Daniel Hyland. SOF ¶ 8.

Plaintiff's performance in 2016-17 was mediocre. Several complaints from customers and other Bank employees were lodged against Plaintiff, stating that she was "rude," "unprofessional," "not at all helpful" and "very combative." SOF ¶¶ 9-11. Plaintiff's supervisor provided performance counseling to her in March 2017 and in April 2017. SOF ¶ 12.

### B.  Santander Investigates Allegations of Offensive Behavior by Plaintiff

On or about June 16, 2017, a Bank employee in the Fraud Department, Corey Black, told Ms. Williams that she was working in an environment that made her uncomfortable. SOF ¶ 13. Ms. Williams contacted Karin Fitch-Urbano, Santander Senior Employee Relations Consultant. SOF ¶ 14. (As a Senior Employee Relations Consultant, Ms. Fitch-Urbano provides consultation to employees and management regarding human resources issues, and conducts workplace investigations. SOF ¶ 15.) Ms. Fitch-Urbano spoke with Ms. Black on June 16, 2017. SOF ¶ 16. Ms. Black told Ms. Fitch-Urbano that on or about June 14, 2017, while several employees were speaking Spanish, Plaintiff said "this was America, and they needed to speak English in America." SOF ¶ 17.

Ms. Fitch-Urbano immediately began an investigation. SOF ¶ 18. She interviewed 11 employees in the Fraud Department who worked with Plaintiff. SOF ¶ 19. In the course of these interviews, Ms. Fitch-Urbano learned the following:

- Four employees witnessed the June 14, 2017 incident: While Plaintiff's co-worker, Jacob Stacy, was practicing his Spanish with his colleagues, Plaintiff stood and said, "this is America, we speak English," or words to that effect. SOF ¶ 20.

- Co-worker Andrew Grossman overheard Plaintiff say, "What do all these black people do here all day? They just stand around." SOF ¶ 21.

3

- In reference to people of color, Plaintiff told co-worker Edith Almeida, "This kind of race makes mistakes." SOF ¶ 22. Another co-worker overheard Plaintiff say that. *Id.*
- Co-worker Aliaksandra "Sasha" Astrakova was speaking her native tongue (Russian) on her phone during her break. Plaintiff was upset that Ms. Astrakova was speaking Russian, and said "How long are you going to do this? I just want some peace and quiet." SOF ¶ 23.
- Several co-workers said that they were fearful of Plaintiff, because she told them that she can find out who snitches on her, and that she had a friend in HR that could get them in trouble (which was not true). SOF ¶ 24.
- Co-worker Andrew Grossman told Ms. Fitch-Urbano, "I'm terrified of her [Plaintiff]." SOF ¶ 25.

Overall, employees conveyed that Plaintiff was creating a hostile work environment because of her behavior; they felt bullied by her; and that they were fearful of her. SOF ¶ 26.

After speaking with these employees, Ms. Fitch-Urbano interviewed Plaintiff. SOF ¶ 27. Ms. Fitch-Urbano went over what she had learned from Plaintiff's colleagues. SOF ¶ 28. Plaintiff admitted that on or about June 14, 2017, she asked her colleagues to stop speaking Spanish. SOF ¶ 29. Plaintiff also admitted that she told Ms. Astrakova that her speaking on the phone bothered Plaintiff. SOF ¶ 30. Plaintiff otherwise denied making the comments her co-workers reported. SOF ¶ 31. Plaintiff also said, "I want to file a complaint against the person who complained against me," but did not offer any concrete allegations apart from her displeasure with being investigated, so there was nothing further for Ms. Fitch-Urbano to look into. SOF ¶¶ 32-34.

Ms. Fitch-Urbano spoke with Mr. Hyland about the results of her investigation. SOF ¶ 35. Mr. Hyland concluded that the comments Plaintiff made, as reported by her co-workers, were

racist and ethnically offensive, and contrary to Santander's Anti-Discrimination & Harassment policy and the Equal Opportunity, Respectful and Safe Workplace policy. SOF ¶ 36. He and Ms. Fitch-Urbano discussed potential courses of action in light of Plaintiff's misconduct, but Mr. Hyland decided to terminate Plaintiff's employment because of her intolerable and discriminatory conduct. SOF ¶ 37.

Ms. Fitch-Urbano consulted with her superiors and with Santander in-house counsel. SOF ¶ 38. The group agreed with Mr. Hyland's request to terminate Plaintiff. SOF ¶ 39. It was further decided that because of her long tenure with the Bank, Plaintiff would be offered what is called a "mutual agreement" – in exchange for a release, Plaintiff would be given a two month nonworking notice period, at the end of which she would resign, and the Bank would not contest her claim for unemployment. SOF ¶ 40.

Plaintiff met with Mr. Hyland, Ms. Williams, and another member of HR on June 26, 2017. SOF ¶ 41. Plaintiff was offered the mutual agreement. SOF ¶ 42. Plaintiff was allowed 21 days, until July 17, 2017, to accept the offered mutual agreement. SOF ¶ 43. Plaintiff did not accept the offer, and therefore her employment was terminated on July 17, 2017. SOF ¶ 44.

Plaintiff was replaced by Brandon Moutinho, who self-identifies as white. SOF ¶ 45.

    C.    **Santander's Severance Plan**

In 2017, Santander maintained the Santander Holdings USA, Inc. Enterprise Severance Policy ("ESP" or the "Plan"). The ESP states that it "is intended to be a welfare benefit plan as defined in Section 3(1) of ERISA" (the Employee Retirement Income Security Act), and employees are "entitled to certain rights and protections under ERISA." SOF ¶ 46. Employees' rights under ERISA are thoroughly explained in the Plan. *Id.* The ESP contains an extensive claims and appeals procedure, in line with ERISA. SOF ¶ 47. Under the ESP, the plan administrator:

> shall have full discretion and authority to interpret the Policy and make findings and conclusions concerning the administration of this Policy, including questions of eligibility and the amount and duration of any severance benefits payable hereunder. In addition, the Plan Administrator shall have full authority to interpret and apply the provisions of this Policy, including the authority to correct any defects or omissions or to reconcile any inconsistencies herein, in such a manner and to such an extent as it shall deem necessary or desirable to effectuate the terms of this Policy.

SOF ¶ 47.

Severance benefits are only provided under the ESP if the plan administrator determines, in its discretion, that an employee was terminated as a result of a "workforce reduction or position elimination," and not for other reasons such as resignation, misconduct, violation of company policies, or unsatisfactory performance. SOF ¶ 48. Severance benefits can be denied, discontinued, or recouped if the plan administrator determines that an employee violated the Plan or the Bank's policies, rules or procedures. SOF ¶ 49. For eligible employees, Santander pays a certain amount of cash over the severance pay period, and provides benefit continuation during the severance pay period. SOF ¶ 50.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where, as here, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). To withstand summary judgment, the non-moving party must present affirmative evidence showing a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The non-moving party's evidence must demonstrate that a trier of fact reasonably could find in her favor on each issue on which she has the burden of proof. *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997). A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is "merely colorable" or "not significantly probative" is insufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252, 264. A plaintiff's obligation to produce

evidence cannot be satisfied by conclusory allegations, empty rhetoric, or unsupported speculation. *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001); *see also DeNovellis*, 124 F.3d at 306 (holding that, where plaintiff relies solely upon such evidence, summary judgment may be appropriate even where intent is an issue). The record demonstrates that Plaintiff cannot meet the elements of her claims of discrimination or breach of contract, and therefore summary judgment is due.

  **B.**  **Plaintiff's Claims of Reverse Race Discrimination Are Baseless**

Plaintiff contends that the Bank discriminated against her based on her race (white). Plaintiff cannot make out a prima facie case, because there are no "background circumstances" that show that Santander is one of the rare employers that discriminates against whites. Furthermore, Plaintiff cannot establish that the reason for her termination – her creation of a hostile working environment by making racist and ethnically insensitive comments – was a pretext to mask discrimination. Her race discrimination allegations should be dismissed.

    **1.**  **Plaintiff Cannot Meet her Prima Facie Case**

In a "reverse discrimination" case, as here, the usual prima facie case[1] is slightly modified. "When plaintiff is a member of a historically favored group," an inference of discrimination "is warranted only when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Adamson v. Multi Cmty. Diversified Servs.*, 514 F.3d 1136, 1149 (10th Cir. 2008); *see Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir.

---

[1] For minorities, the usual prima facie case of discrimination is (1) the claimant belongs to a protected class; (2) she performed her job at an acceptable level; (3) she was subject to an adverse employment action; and (4) her employer sought a replacement with similar qualifications. *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 40-41 (2005).

7

2006) (same); *Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004) (same); *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (same).[2]

There are no "background circumstances" of reverse discrimination here. The person who did the investigation into Plaintiff's misconduct, Ms. Fitch-Urbano, and the person who decided to terminate Plaintiff, Mr. Hyland, are both white. The person who replaced Plaintiff is white. *See Phelan*, 347 F.3d at 685 (dismissing case because managers and plaintiff's replacement were white). Further, more than half of the Fraud Department employees at Plaintiff's level (95 / 171, 55 %) are white. SOF ¶ 51; *see Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 68 (6th Cir. 1985) (finding no background circumstances where "the majority of [plaintiff's colleagues] were white"). Plaintiff thus cannot establish a prima facie case of race discrimination, and this claim should be dismissed.

### 2. Plaintiff Cannot Prove That Her Termination Was a Pretext to Mask Race Discrimination

Even if she could make out a prima facie case, "to avoid summary judgment [Plaintiff] must raise a genuine issue of material fact that the reasons offered by [Santander] were a pretext for discrimination." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015). At this stage, Plaintiff "must produce sufficient evidence to create a genuine issue of fact as to two points: (1) the employer's articulated reasons for its adverse actions were pretextual, and (2) the real reason for the employer's actions was discriminatory animus." *Id.*; *see Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 54-55 (2005) (plaintiff's burden is "to establish that the basis of [the employer's]

---

[2] While Santander is unaware of any Massachusetts decisions addressing the prima facie case in a reverse discrimination case, the SJC "assume[d]" that federal standards apply under c. 151B with respect to allegations of reverse discrimination. *Drinkwater v. Sch. Comm. of Boston*, 406 Mass. 756, 759 n.2 (1990).

decision was unlawful discrimination by adducing evidence that the reasons given by [the employer] for its actions were mere pretexts to hide such discrimination").

There is more than adequate evidence in the record to show that the reason for Plaintiff's termination was not pretextual – and nothing to show that the Bank was motivated by animus because she is white. After receiving a complaint from one of Plaintiff's co-workers, Ms. Fitch-Urbano conducted an extensive investigation, interviewing 12 Fraud Department employees including Plaintiff. In the course of this investigation, Bank employees reported that Plaintiff created a hostile work environment. Plaintiff made racist comments, including "What do all these black people do here all day? They just stand around," and "This kind of race makes mistakes." Other employees stated that Plaintiff made ethnically offensive comments relating to her dislike of people speaking foreign languages. Plaintiff also threatened her co-workers that she would find out who "snitched" on her and report them to HR. Plaintiff's colleagues described her as a bully, said they were fearful of her, and one person even said he was "terrified" of her. The Bank's policies require all employees to act professionally, show respect for others, and foster a respectful, inclusive, and productive work environment. Mr. Hyland concluded that Plaintiff's conduct violated these requirements and were contrary to the Bank's commitment to equal employment opportunities and a safe and respectful workplace, and for that reason chose to terminate her employment.

Plaintiff does not deny telling her co-workers to stop speaking Spanish on June 14, 2017, and does not deny asking a Russian-speaking colleague to stop talking on the phone. While Plaintiff disputes that she engaged in the other racist misconduct identified during the investigation, as a matter of law, that is irrelevant. At summary judgment, the Court's "task is limited to determining whether the employer believed in the accuracy of the reason given for the

9

adverse employment action." *Espinal v. Nat'l Grid NE Holdings 2, LLC*, 693 F.3d 31, 35 (1st Cir. 2012); *see Wooster v. Abdow Corp.*, 46 Mass.App.Ct. 665, 673 (1999) (to "withstand a defendant's motion for summary judgment, a plaintiff claiming discrimination must show something more than a conflict in the evidence regarding the employer's legitimate, nondiscriminatory explanation for the employment decision"). "This holds true even when the decisionmaker is relying on information that may later prove to be inaccurate. In other words, it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception." *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 67 (1st Cir. 2008). "It is the decisionmaker's reasonable belief that guides the inquiry, not whether the employee was or was not guilty of the suspected misconduct." *Id*. at 70 (emphasis supplied); *see also Valls v. O'Sullivan Corp.*, 67 Mass. App. Ct. 1113, at *5 (2006) (holding lack of evidence supporting decisionmaker's termination decision does not preclude summary judgment).

Here, multiple employees stated that Plaintiff made offensive comments. Mr. Hyland credited these employees' complaints over Plaintiff's self-serving denials. There is nothing in the record that would suggest that Mr. Hyland did not actually believe that Plaintiff engaged in racist behavior, and thus no evidence of pretext to mask discrimination. *See Bennett v. St.-Gobain Corp.*, 507 F.3d 23, 31-32 (1st Cir. 2007) (whether plaintiff engaged in misconduct or not "is largely beside the point: what counts is whether the decisionmaker … believed the plaintiff" engaged in misconduct); *Kouvchinov*, 537 F.3d at 70 (even assuming plaintiff had not engaged in misconduct, that would not establish pretext); *Dorman v. Norton Co.*, 64 Mass.App.Ct. 1, 9 (2005) (distinguishing the "alleged falsity of [the] accusation that [plaintiff] had been sleeping" with "the falsity … of the reasons given by the employer for his discharge"); *Tian v. Aspen Tech., Inc.*, 53

F.Supp.3d 345, 364 (D.Mass. 2014) (in order to overcome termination based upon performance or disciplines, the plaintiff was required to show the employer's justification is "untruthful").

Furthermore, Plaintiff cannot establish that Santander acted worse towards her than other non-white employees who had engaged in similar misconduct.  "To raise an inference of racial discrimination," Plaintiff would need to "show[] that others similarly situated to [her] in all relevant respects were treated differently" by the Bank.  *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999); *see Matthews v. Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997) (same).  There is no evidence that Santander tolerated other employees engaging in racially and ethnically objectionable behavior comparable to Plaintiff's conduct, and thus no basis to find discrimination.  *See id.*

Plaintiff may also argue that her conduct did not warrant termination.  However, "courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions."  *Sullivan*, 444 Mass. at 56; *see Pina v. Children's Place*, 740 F.3d 785, 798 (1st Cir. 2014) (same).  Plaintiff may disagree with Mr. Hyland's decision, but that "is immaterial. … There is nothing on the record to suggest that it was discriminatory, that he treated other employees who acted similarly to [Plaintiff] in a different manner, or that he violated [Santander] policy when firing [Plaintiff]." *Pina*, 740 F.3d at 798; *see Espinal*, 693 F.3d at 35 ("Plaintiff's disagreement with [defendant's] reasons for disciplining him, on this record, does not allow inferences of pretext or discrimination").  There is no evidence of race discrimination here, and therefore summary judgment should be granted to Santander.

### C. Plaintiff's Age Discrimination Claims Should Be Dismissed

Plaintiff also alleges age discrimination against Santander.  For purposes of this Motion, Santander will not contest that Plaintiff can make out a prima facie case of age discrimination.  However, as with her race claims, Plaintiff must additionally establish that the reason stated for

11

her termination was a pretext to mask discrimination. *See Ray*, 799 F.3d at 113; *Sullivan*, 444 Mass. at 54-55. As discussed above, Plaintiff cannot do so: there is nothing in the record showing that Mr. Hyland did not believe that Plaintiff engaged in the misconduct ascribed to her; that Mr. Hyland was motivated by anything except Plaintiff's offensive behavior; or that Mr. Hyland treated anyone who engaged in comparable misconduct differently.

Plaintiff may note that some of the employees hired by the Bank for fraud analyst positions in 2017 were under 40. This is inapposite. While statistical evidence may be used to establish a prima facie case of discrimination, "it has limited probative value at [the pretext] stage," and "does not, by itself, create reasonable inferences of discriminatory animus and causation." *Sullivan*, 444 Mass. at 55. Furthermore, "statistics that do not account for [the] employer's legitimate nondiscriminatory explanations do not establish pretext." *Id.* To the extent the fraud analysts hired in 2017 skewed younger, that was because those jobs were entry-level, call center positions, and the applicants for the jobs tended to be younger. Hyland Dep. 73, 100-01. Santander does not consider age in its hiring process (or otherwise), and indeed many of the best performers in the Fraud Department were older. Hyland Dep. 73. Raw statistics regarding hiring in one year, without more, does not prove that Plaintiff was treated differently because of her age.

"Nothing in the record supports an inference that the reason for termination of [Plaintiff's] employment was anything other than [her] own conduct in [] harassing" her co-workers. *Rivera-Garcia v. Sistema Univers. Ana G. Mendez*, 442 F.3d 3, 7 (1st Cir. 2006). Summary judgment should therefore be granted to Santander as to Plaintiff's age discrimination claims.

**D.    Plaintiff's Breach of Contract Claim Is Meritless**

Plaintiff also brings a breach of contract claim, alleging that Santander "failed to remit severance benefits that she was lawfully entitled to." Compl. ¶ 16. This fails on two grounds. First, the applicable severance plan, the ESP, is governed by ERISA, and therefore Plaintiff's state-

12

law claims are preempted. Second, Plaintiff was not terminated as part of a workforce reduction or position elimination, and therefore not entitled to severance benefits under the ESP. This claim should be dismissed as well.

### 1. The Breach of Contract Claim Is Preempted

Section 514 of ERISA expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144. This preemption provision is "conspicuous for its breadth." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). ERISA Section 502, 29 U.S.C. § 1132, also provides a civil enforcement mechanism described as the "exclusive federal cause of action for resolution of such [recovery of benefits] disputes." *Met. Life Ins. Co. v Taylor*, 481 U.S. 58, 63 (1987). A state-law claim is preempted if (1) the plan at issue is an "employee benefit plan" within the scope of ERISA, and (2) of the claim "relates to" the plan. *Hampers v. WR Grace & Co., Inc.,* 202 F.3d 44, 49 (1st Cir. 2000).

#### a. The ESP Is an ERISA Employee Benefit Plan

The ESP explicitly states it is governed by ERISA, contains ERISA procedures and remedies, requires discretionary decisions by the plan administrator, and provides for periodic benefits. All of these elements show that it qualifies as an ERISA employee benefit plan.

"Perhaps most importantly," the ESP contains "a comprehensive 'ERISA' paragraph, i.e., it actually describes the policy as ERISA-based, outlines [the Bank's] 'fiduciary' duties under ERISA, and notifies participants of their right of judicial review pursuant to ERISA." *Dulchinos v. Bay State Gas C*o., 462 F.Supp.2d 155, 160 (D.Mass. 2006). This logically supports ERISA coverage. *See id.*; *Gordon v. AstraZeneca AB*, 199 F.Supp.3d 325, 332 (D.Mass. 2016) (severance plan covered by ERISA because it "contain[ed] clear statements of intent that this is an ERISA plan").

Further, the ESP grants the plan administrator the discretion to interpret the Plan, make decisions as to eligibility, and make decisions about the amount and duration of any severance benefits. Severance is only provided if the plan administrator determines that an employee's separation was due to a workforce reduction or position elimination, and not for reasons such as misconduct, violation of company policies, or unsatisfactory performance. The administrator can also stop or recoup benefits already granted for violations of the Plan or Bank policy. This discretion shows that the ESP is subject to ERISA. *See Gordon*, 199 F.Supp.3d at 331 (severance plan covered by ERISA because it "grants discretion to the administrator to construe its terms"); *Dulchinos*, 462 F.Supp.2d at 160 (severance plan covered by ERISA because determination of eligibility was in administrator's sole discretion).

The ESP also provides for severance pay and benefits to be disbursed over time, throughout the severance period (not as a lump sum), and benefits can be discontinued if the employee violates the Plan or Bank policies. This ongoing administration requirement further indicates it is subject to ERISA. *See Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 853 (1st Cir. 1993) (severance was governed by ERISA because "the time period is prolonged" and "individualized decisions are required"); *Gordon*, 199 F.Supp.3d at 332 ("ongoing benefit payments [] constitute a typical ERISA plan"); *Nadworny v. Shaw's Supermarkets, Inc.*, 405 F.Supp.2d 124, 132 (D.Mass. 2005) ("that an employer has an obligation to disburse benefits on a long-term or periodic basis weighs in favor of ERISA preemption").

"The general rule is that severance packages are covered by ERISA." *Dulchinos*, 462 F.Supp.2d at 159. The ESP is no exception. Based on its terms, it qualifies as an ERISA employee benefit plan.

### b. Plaintiff's Breach of Contract Claim Relates to the ESP

There should be no dispute that Plaintiff's breach of contract claim relates to the ESP. Plaintiff is seeking severance benefits, which only come from the ESP. This claim "directly [seeks] to recover benefits due to [plaintiff] under the terms of [the] plan," and thus falls "squarely within the scope of ERISA." *Negron-Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 7 (1st Cir. 2008); *see Gordon*, 199 F.Supp.3d at 332 ("claims for breach of contract … relate to the Plan and are thus preempted by ERISA"); *Dulchinos*, 462 F.Supp.2d at 160 (same). The contract claim is preempted and should be dismissed. *See id.*; *Campbell v. BankBoston*, 206 F.Supp.2d 70, 79 (D.Mass. 2002) (claims for severance preempted), *aff'd* 327 F.3d 1 (1st Cir. 2003); *Joyce v. John Hancock Fin. Serv., Inc.*, 462 F.Supp.2d 192, 211 (D.Mass. 2006) (same).

### 2. Plaintiff Was Not Eligible for Severance Benefits

Even if the ESP were not covered by ERISA, Plaintiff's breach of contract claim fails because she would have never been eligible for severance under that Plan. The ESP only provides severance to employees whose "positions are involuntarily terminated by Santander US in its capacity as employer as a result of workforce reduction or position elimination." SOF ¶ 48. Severance is not available if employment ends for any other reason. *Id.* It is undisputed that there was no "workforce reduction or position elimination" here: Plaintiff's job was filled not long after she left. Plaintiff was not entitled to severance benefits, and therefore cannot make out a breach of contract claim. This count should be dismissed.

## III. CONCLUSION

For the foregoing reasons, the Court should grant Santander summary judgment and dismiss all of Plaintiff's claims with prejudice.

Respectfully submitted,

**SANTANDER BANK, N.A.**

By its attorneys,

/s/ Stephen T. Melnick
Stephen T. Melnick (BBO No. 667323)
**LITTLER MENDELSON, P.C.**
One International Place, Suite 2700
Boston, MA  02110
Phone 617.378.6000
Fax 617.737.0052
smelnick@littler.com

Dated:  November 30, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of November 2020, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, is available for viewing and downloading from the ECF system, will be sent electronically to counsel of record as registered participants identified on the Notice of Electronic Filing and via first class mail to all non-registered participants identified on the Notice of Electronic Filing.

/s/ Stephen T. Melnick
Stephen T. Melnick