# Exhibit D

1

Volume:   1
Pages:    1-155
Exhibits: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 1:19-CV-10845-ADB

*********************************x
GAIL SWEENEY

                 Plaintiff

vs.

SANTANDER BANK, N.A.
                 Defendant
*********************************x

DEPOSITION OF DANIEL J. HYLAND

APPEARING REMOTELY FROM

FRAMINGHAM, MASSACHUSETTS

TUESDAY, NOVEMBER 3, 2020

10:21 a.m.

Reported by:

Camille Macomber, CSR No. 149608
Registered Professional Reporter
Appearing Remotely from Norfolk County, Massachusetts

SHEA COURT REPORTING SERVICES
15 Court Square, Suite 920
Boston, Massachusetts 02108
(617)227-3097
sheacourtreporting@gmail.com

2

REMOTE APPEARANCES:


COUNSEL FOR THE PLAINTIFF:
    LAW OFFICES OF SCOTT C. HOLMES
    50 Main Street, Unit 12
    Charlestown, Massachusetts 02129
    (617)850-2734
    scott@scottcholmes.com
    By:  Scott C. Holmes, Esquire


COUNSEL FOR THE PLAINTIFF:
    JAMES E. NEYMAN & ASSOCIATES, P.C.
    76 Canal Street, 3rd Floor
    Boston, Massachusetts 02114
    (617)723-2608
    james@neymanandassociates.com
    By:  James Neyman, Esquire


COUNSEL FOR THE DEFENDANT
    LITTLER MENDELSON, P.C.
    One International Place
    Suite 2700
    Boston, Massachusetts 02110
    (617)378-6000
    smelnick@littler.com
    By:  Stephen Melnick, Esquire


Also Appearing Remotely:

    Gail Sweeney

51

1            was multiple issues that led to the termination,

2            not that one in and of itself.

3    Q.    What else led to it?

4    A.    Let me answer the other part of your question

5            first.

6                 We had somebody that, the way that that

7            was delivered or whatever transpired at the

8            time, it was a concern for one of our colleagues

9            that was raised up to Employee Relations.

10           Employee Relations' duty then is to look into

11           that and determine what the appropriate next

12           steps are.  It was determined that the

13           appropriate next steps were to conduct an

14           investigation, which is what took place where

15           more information was composed.

16                 You know, some of those other things go

17           back to the follow-up question you just asked.

18           There were comments, if I remember correctly,

19           around African-American that were racially

20           insensitive.  And I believe there was another

21           comment around team members that were speaking

22           in another language other than English.

23   Q.    What was racially insensitive?

24                 MR. MELNICK:  Objection.

1    A.    I believe the comments were paraphrasing, it was

2           about African-Americans, "They sit around.  What

3           are they even doing?"  Something like that.

4    Q.    Would it be fair to say that that's actually --

5           first of all, she denied that, correct,

6           Ms. Sweeney?

7    A.    I believe so, if I remember correctly, that

8           comment in particular.

9    Q.    And half the people -- at least half the people

10         interviewed knew nothing about that.  Are you

11         aware of that?

12             MR. MELNICK:  Objection.

13    A.    I don't recall.

14    Q.    So if that's true, then, wouldn't you say that

15         the credibility of that comment is somewhat

16         suspect?

17             MR. MELNICK:  Objection.

18    A.    I wouldn't speculate.  I don't know who was

19         spoken with, who corroborated, who didn't.

20    Q.    Would it be fair to say that she wasn't saying

21         it, if as alleged, generally; it was directed at

22         specific employees.  Are you aware of that?

23             MR. MELNICK:  Objection.

24    A.    Sorry.  Can you repeat that question?

55

```
 1   A.    Is the question whether I have seen this
 2         statement on this document?
 3   Q.    Yes.
 4   A.    Not that I recall.
 5   Q.    I would like you to then switch to Exhibit 13,
 6         Andrew Grossman, page 415.
 7                     (Exhibit No. 13, Andrew Grossman
 8                     Interview, screen-shared.)
 9   Q.    Have you ever seen this document?
10   A.    I don't recall.
11   Q.    Are you aware that this is part of Ms. Urbano's
12         investigation?
13               MR. MELNICK:  Objection.
14   A.    I was familiar at the time that there were
15         racially insensitive comments made.
16   Q.    That wasn't my question though, respectfully.
17         I'm asking you, are you familiar with this
18         document?
19   A.    I don't recall whether or not I had seen this
20         specific document at the time.
21   Q.    Do you see where it says above the comment from
22         Andrew, "What do all of the black people do
23         here - all just stand around"?
24   A.    Yes, I see that.
```

1    Q.   Is that the insensitive comment you're referring

2        to?

3    A.   That's the commentary I was referencing earlier,

4        paraphrasing earlier.  I'm aware of that.

5    Q.   Are you aware that that comment was never said

6        to any African-Americans?

7    A.   I don't recall the details of who it was said

8        to.

9    Q.   Well, do you see above, it says, "References:  3

10        black colleagues."  Do you see that?

11    A.   I do.

12    Q.   So would it be fair to say you didn't know that

13        at the time you terminated Ms. Sweeney?

14           MR. MELNICK:  Objection.

15    A.   Again, can you ask me that question one more

16        time before I answer it, please?

17    Q.   Would it be fair to say that you didn't know

18        that Andrew Grossman was referring to the

19        comment referenced "3 black colleagues" only?

20    A.   Again, I don't recall the details; I do recall

21        the commentary.

22    Q.   If you knew that two of those were fired for

23        poor performance, and the third left, would that

24        still be a racist comment, in your opinion?

58

1    Q.    But it says above, "Referencing:  3 black

2          colleagues," which I submit you didn't know when

3          you made your decision.

4                MR. MELNICK:  Objection.

5    Q.    And if you take the reason that they were

6          terminated, that would justify a comment on poor

7          performances, wouldn't it?

8                MR. MELNICK:  Objection.

9    A.    So you're asking for my opinion.  I think if

10         your opinion is that "what do all of the black

11         people do here" regardless of who it's in

12         reference to is not a racist comment, I

13         disagree.

14   Q.    That's not my comment, though.  If it's taken,

15         and you only got part of the statement, the

16         remainder of the statement says, "In reference

17         to 3 black colleagues" with 3 underlined.  And

18         then their names are given.

19               MR. MELNICK:  Objection.

20   Q.    Can you tell me how that's racist?

21               MR. MELNICK:  Objection.  He's answered

22         that several times.

23               MR. NEYMAN:  No, he hasn't.  He has not

24         answered how that in conjunction with the three

59

```
 1              named employees is racist.

 2    A.    Again, I would submit that "What do all of the

 3          black people do here - all just stand around" in

 4          quotes is a racist comment.  Whether it's in

 5          reference to three specific black colleagues

 6          with poor performance or exceptional performance

 7          or 30 African-American colleagues with poor

 8          performance or exceptional performance.  "What

 9          do all these black people do here?"  I take as a

10          racist comment.

11    Q.    Okay.  So even if it actually refers to three

12          people?

13              MR. MELNICK:  Objection.  He just said

14          that.

15    Q.    It's not a condemnation of the entire race, it's

16          three people at work.

17              MR. MELNICK:  Objection.

18    Q.    Two of which got fired, if you look at the list

19          of employees that was provided by your counsel.

20          August was clearly -- we've been through that in

21          other depos -- he was going to be terminated for

22          poor performance.  I looked up all three.  Two

23          of them, I can't recall at the moment, were

24          terminated for performance, and one left.  So
```

1          "What do all the black people do here - all just
2          stand around," that appears to be the full
3          comment.  There appears to be an arrow pointing
4          to -- coming from that comment that seems to
5          indicate that Andrew Grossman believes that that
6          comment in its entirety is in reference to three
7          specific colleagues.
8    Q.    Right.
9    A.    So that comment in quotes, "What do all the
10         black people do here - all just stand around,"
11         is a racially insensitive comment.
12   Q.    Regardless of whether it's in conjunction with
13         three employees, two of which were terminated
14         for performance?
15              MR. MELNICK:  Objection.
16   A.    The performance of the employees that Andrew
17         Grossman believes that this was in reference to
18         doesn't change the racial insensitively
19         associated with the comment itself.
20   Q.    Nor the fact that it's referring to three
21         people, in your opinion?
22   A.    Just my opinion.  I don't believe that a number
23         of employees that that comment Andrew Grossman
24         believes it's referencing is material.  Whether

63

1          it's one or twenty, I think it's a racially

2          insensitive comment.

3     Q.   Did you ever talk to Gail about this?

4          MR. MELNICK:  Objection.

5     A.   I don't believe so.

6     Q.   There's about half as many denied comments, at

7          least, that she said anything racially

8          insensitive, including yourself, so how did you

9          make your determination on who to believe?

10         MR. MELNICK:  Objection.

11    A.   So Karin, from Employee Relations, walked me

12         through the results of the investigation, we

13         looked at all those results together and the

14         decision was made to move forward with the

15         termination based on those results.

16    Q.   But that's not answering the question.  Did you

17         know when you made your decision that several

18         people denied hearing any comments?

19         MR. MELNICK:  Objection.

20    A.   I don't remember the specifics of our

21         conversation, but I do know that she talked to

22         multiple people.  Again, I wouldn't speculate as

23         to what specifically they talked about.

24    Q.   Would it be fair to say that there were no

1           the role.

2      Q.   So it is purely coincidence that in 2017 out of

3           40 people hired, 36 were under 40.

4                MR. MELNICK:  Objection.

5      A.   Typically, in call center type roles, the folks

6           that are applying for those types of roles tend

7           to skew younger.  That may drive that statistic

8           you just pulled up, but it's certainly not --

9           some of our top performers are older.  So it's

10          certainly not something that we consider as part

11          of our hiring process.

12     Q.   Can you name any of those top performers because

13          it doesn't seem like there's -- there's only a

14          handful or less of people over 50.

15               MR. MELNICK:  Objection.

16     A.   Is the question you're asking me to name someone

17          on my team right now that's over 50 and a top

18          performer?

19     Q.   Yes.  How many people can you name?

20     A.   Sure.  One that comes to mind is Edith Almeida.

21     Q.   Anyone else?

22     A.   I don't know the exact ages of the folks on my

23          team, but Edith is a good example.  She's been

24          with the team for a long time.

```
 1    A.    I don't know.  It would be interesting to see

 2          the year before that what the percentage was or

 3          the year after that.  Right.  I don't know that

 4          that in and of itself -- as I mentioned earlier,

 5          a lot of these roles are call center roles.  A

 6          lot of the applicants that we have historically

 7          across all call centers, also thinking about

 8          previous lives in other organizations, tend to

 9          skew younger.  So I don't know that that shows a

10          trend in any direction without having that same

11          information for the previous year.  And whether

12          it does or not, the only thing that we take into

13          account is who are the most qualified candidates

14          when we have an open requisition, we have a

15          standard review process, and that's how our

16          hiring works.  There's no ulterior motives,

17          there's nothing else behind it.

18    Q.    Well, I thought you said you didn't know the

19          ages of the employees, so how do you know that's

20          true?

21                MR. MELNICK:  Objection.

22    A.    I'm reacting to your statement that said, I

23          believe, 36 out of the 40 were -- I don't know

24          what the age.
```

1    Q.    Under 40.

2    A.    Under 40?

3    Q.    Yes.

4    A.    And I'm saying that generally speaking positions

5          in contact centers, folks that apply for those

6          positions tend to skew younger, in my

7          experience.  Not that I know the ages of

8          everybody on my team.

9    Q.    Turning to Exhibit 21.  It's an email from you

10         to Ms. Urbano, 000154.

11               (Exhibit No. 21, Email dated

12               10/16/19, screen-shared.)

13   Q.    If there was a disproportionate number of

14         employees over 40, either being terminated or

15         leaving the company around the time of Gail

16         Sweeney, could you at least infer that one of

17         the reasons might be due to age --

18            MR. MELNICK:  Objection.

19   Q.    -- or would that be speculation?

20   A.    It would be speculation.

21   Q.    Going to 154, there's an email from you to

22         Ms. Urbano.  This is obviously around the

23         termination time.  At the top, just so I'm

24         clear, what is an EAR complaint?

1    Q.    The meeting to terminate Gail, was anyone taking

2          notes at that meeting?

3    A.    No, I don't believe so.

4    Q.    So as far as what was said to Gail as far as the

5          specific reason for her termination, that does

6          not exist in writing?

7                MR. MELNICK:  Objection.

8    A.    No, the verbatim language used is not

9          transcribed anywhere.

10   Q.    So what is your memory of exactly what was said?

11         Strike that.

12               What was given as the reason?

13   A.    Again, there was no reason.  If memory serves,

14         the basis of the termination was behavioral

15         based on conduct tied to racially insensitive

16         and discriminatory behavior and remarks.

17   Q.    Anything else?

18   A.    Not that I recall.

19   Q.    And you were the one delivering this?

20   A.    I was, in conjunction with Perry from Employee

21         Relations.

22   Q.    I would like you to refer to Exhibit 18, please.

23               (Exhibit No. 18, Email, Subject:

24               Hostile Environment Complaint,

117

1             types of discipline were discussed?

2    A.    Again, so when speaking with Employee Relations,

3          obviously there's awareness of all of the

4          different options and we talked through what's

5          the most appropriate.  This scenario would have

6          been no different.

7    Q.    What was said and who said it?

8                MR. MELNICK:  Objection.

9    A.    I don't recall.

10   Q.    So, as we sit here today, do you have a specific

11         memory of speaking to someone about potential

12         outcomes here of different types of discipline?

13   A.    Yes.  So at the time, Karin Urbano and I, in

14         going through this scenario, the results of the

15         investigation had dialogued around what the

16         appropriate course of action was, including

17         final written warning, written warning,

18         termination, all of the potential courses of

19         action that we had available to take.

20   Q.    I would like you to refer to Exhibit 28, Answers

21         to Interrogatories, page 5.

22                (Exhibit No. 28, Answers to

23                Interrogatories, screen-shared.)

24   A.    Is there something specific you want me to

```
 1              then something like performance and tenure would

 2              carry less weight and would not feed into the

 3              ultimate decision that we landed on of

 4              termination.

 5    Q.        How many times have you met Attorney Melnick on

 6              this case -- met with?

 7    A.        We had one call last week.

 8    Q.        Any other time?

 9    A.        No.

10    Q.        So one meeting in October of 2020 with Attorney

11              Melnick to prepare for this deposition; correct?

12    A.        I believe it was the 29th.

13    Q.        Any other attorney?

14    A.        No.

15              MR. NEYMAN:  I'm almost done.

16    Q.        Would it be fair to say that the three alleged

17              incidents being, for lack of a better term,

18              English to Spanish event, alleged racial

19              comment, and the Russian conversation in the

20              break room were the basis of the termination or

21              am I putting words in your mouth or is it

22              something different?

23              MR. MELNICK:  Objection.

24    A.        Those were certainly key elements.  In addition
```

132

```
 1              to that, again, I believe we talked about it
 2              earlier and if I remember correctly, there was
 3              also a comment around newer hires that when
 4              you're in the U.S., you speak English, something
 5              to that effect.  But yes, those four -- the
 6              Russian -- speaking in Russian, I don't quite
 7              recall.  I do recall the other three.  But those
 8              were certainly key elements in the final
 9              decision.
10    Q.       Are you positive about that?
11              MR. MELNICK:  Objection.
12    Q.       To the best of your knowledge?
13    A.       To the best of my recollection, those items were
14              key elements in the decision.
15    Q.       And again, anything else, as we sit here today?
16    A.       Nothing specific that I can recall.
17    Q.       Do you know Christine Ciarrocchi?
18    A.       I'm unfamiliar with that name.
19    Q.       So if I advise or suggested that she's an
20              attorney that did work for Santander, that would
21              have no input on you or recollection or reminder
22              to you in any way?
23    A.       I'm unfamiliar with the name.
24    Q.       Do you consider one's state of mind in making
```

139

```
 1              MR. NEYMAN:  Can you tell me what page it
 2         is?
 3              MR. MELNICK:  SBNA 355 and 356 is being
 4         marked as Exhibit 30.  Are we all on the same
 5         page?
 6              MR. NEYMAN:  I'm just voicing an objection
 7         for the record, but yes.
 8    Q.   Mr. Hyland, do you recognize this document,
 9         Exhibit 30?
10    A.   Yes.
11    Q.   What is this document?
12    A.   This is the outline of the discussion that we
13         held with Gail at her termination.
14    Q.   And how did you get this document?
15    A.   It came from Karin from Employee Relations.
16    Q.   To the best of your recollection, does this
17         outline the discussion that you had with
18         Ms. Sweeney about her termination.
19              MR. NEYMAN:  Objection.
20    A.   It does.
21    Q.   I believe you said that Perry Vachon also spoke
22         at that meeting?
23    A.   She did.
24    Q.   Can you tell me what parts of this Exhibit 30
```

1        that you went over and what parts Ms. Vachon

2        went over?

3  A.    Sure.  The beginning piece -- again, this was a

4        while back.  But the first piece was Employee

5        Relations; the termination section, as indicated

6        on this document, was handled by me; and then I

7        turned it back over to Perry for this final

8        separation agreement to walk through some of the

9        further details.

10  Q.    So in that underlined parts where it says, "By

11        manager," that's when you would have been

12        speaking; correct?

13  A.    That's right.

14  Q.    And by Employee Relations would have been when

15        Ms. Vachon was speaking?

16  A.    Correct.

17  Q.    The decision to terminate Ms. Sweeney or end her

18        employment, was that based on her age at all?

19        MR. NEYMAN:  Objection.

20  A.    Not at all.

21  Q.    Was that based on her sex or gender at all?

22  A.    Not at all.

23        MR. MELNICK:  Nothing further from me.

24        MR. NEYMAN:  Can you go to the top?

# Hyland Dep.
# Exhibit 30



EXHIBIT 30

Daniel Hyland
11/3/20
Stenographer: Camille Macomber
RPR, CSR #149608

| Message | |
| --- | --- |
| **From**: | Fitch-Urbano, Karin A [karin.fitch@santander.us] |
| **Sent**: | 6/23/2017 5:16:25 PM |
| **To**: | Hyland, Daniel J [daniel.hyland@santander.us]; Williams, Kim L [kwillia6@santander.us] |
| **Subject**: | Script: meeting w/ Gail |

A.    <u>Introduction - By Manager</u>

a.    Hello Gail, we are here today with Perry Vachon from Employee Relations to follow up on a serious matter brought to our attention regarding continued concerns about your workplace communications.

B.    <u>Reference to Issue  - By Employee Relations</u>

a.    As you know, concerns were raised about your vocal intolerance of foreign languages in the workplace or on the phone. Given our diverse colleague and customer base, we take such allegations very seriously.

b.    Employee Relations undertook an investigation and has found that you've been openly vocal about demanding English only in both the office and on the phone. This has been found to be offensive and discriminatory to several colleagues based on their national origin.

c.    It was also found that you have been vocal on more than one occasion about certain racial and ethnic groups speaking of them in a disparaging manner in the office.

C.    <u>Termination – By Manager</u>

a.    Gail, in addition to causing discomfort to colleagues, this has been severely disruptive to the team and negatively impacted your job performance.

b.    I find your conduct inappropriate and disrespectful toward colleagues and customers. Colleagues do not deserve to feel uncomfortable at the office simply because of who they are based on their native language, ethnicity, or race.

c.    This is a violation of basic professional standards and the Code of Conduct which are founded on respect for diversity.  Mutual respect for our differences is fundamental to our success as a team and as an organization.

d.    I must therefore inform you that, because of your repeated conduct, management has lost trust and confidence in your ability to perform effectively at Santander.

e.    As a result, the Bank has decided that it has grounds to terminate your employment.

D.    <u>Separation Agreement – By Employee Relations</u>

a.    As we recognize that immediate termination may result in a hardship for you, the Bank has approved giving you an opportunity to resign by mutual agreement providing you an Extended Paid Notice Period through August 25th.

b.    This means that you will go home today, and your termination date will be set for <u>August 25, 2017</u>.  The time period between now and 8/25 will be fully paid and you will continue your benefits coverage. In addition, the Bank will not contest any claim for unemployment benefits.

c.    In order to receive the extended notice period, you must sign this Separation Agreement [hand two copies of Agreement, plus EAP brochure].

d.    There are two Acceptances to sign:

i. First, you have 21 days to sign Acceptance #1, which will trigger the fully paid non-working notice period until Termination Date of 8/25/17.

ii. Second, you have up to 7 days after 8/25 to sign Acceptance #2 for Santander to refrain from contesting unemployment benefits

e.        Importantly, please be advised that if you choose not to sign the Agreement, your effective termination date shall be 21 days from today.

f.        [Collect badge, i-phone, laptop; gather TM's personal belongings and escort out of building]

[Provide opportunity to ask questions]


<u>Possible FAQ's</u>

**Q: This is unfair – I did not do anything wrong. Can I appeal this decision?**

A: Employee Relations conducted a thorough, confidential investigation and have substantiated accounts about your conduct. There is no appeal, and this decision is final.

**Q:  This is all fabrication, and you are discriminating / retaliating against me.**

A:  We can assure you that Employee Relations ensured a fair and objective review of this situation in accordance with Santander policy which prohibits discrimination and retaliation. Your conduct has, unfortunately, caused management to lose trust and confidence in your ability to continue effectively as a team member.

**Q:  Who did you interview, what about my point of view? Can I see your investigation report?**

A:  Employee Relations assures team members who participate in HR investigations of confidentiality, and the investigation is considered confidential for HR use only.  Employee Relations have substantiated your communications from multiple sources.

**Q: What about [name] or [name]? They say terrible things in the office too.**

A:  We cannot discuss other personnel actions for confidentiality reasons, just as you would not appreciate your personnel matters being discussed with other colleagues. However, we can assure you that appropriate HR actions regarding other team members will be taken.




**Karin Fitch-Urbano**
HR Employee Relations Lead Consultant

5 Whittier Street
Framingham, MA. 01701
Telephone: 508-808-6614 (376614)
Fax: 508-270-6037
Mail Code: MA1-WHT-0602
Karin.Fitch@Santander.us