UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GAIL SWEENEY,            )<br>                          )<br>      Plaintiff,         )<br>                          )<br>      v.                  )<br>                          )<br>SANTANDER BANK, N.A.      )<br>                          )<br>      Defendant           )<br>                          ) | **CA No. 19-CV-10845-ADB** |

**PLAINTIFF'S OPPOSITION TO SANTANDER BANK, N.A.'s MOTION FOR SUMMARY JUDGMENT**

Plaintiff Gail Sweeney (Plaintiff or Sweeney) was employed by Santander Bank, N.A. (Santander of Bank) and its predecessors for thirty-three years before she was fired in June 2017, when she was sixty years old.  For purposes of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §623 et seq., there is no dispute that she is a member of a protected class and was replaced by a twenty-five year old new hire in the fraud department at a lower rate of pay.  Gail Sweeney's Response to Defendant's Statement of Material Facts and Additional Material Facts "SOF" ¶45.

Santander has adduced numerous reasons why Sweeney was terminated, but there exists sufficient evidence to create a genuine issue of fact as to whether the defendant's "non-discriminatory reason is mere pretext and the real reason was discrimination."  *Quinones v. Houser Buick*, 436 F.3d 284, 289 (1st Cir. 2006)(citations omitted).

1

Over the course of a thirty-three year career at the Bank, Sweeney was never accused of discrimination or harassment. SOF ¶60. In her most recent performance review prior to termination (December 2016), less than six months prior to events leading to her termination, her supervisor, Jose Claudio agreed that she was "tolerant of the ideas, values and opinions of others…and "clearly expresses her opinion, though respecting those of others, " SOF ¶61. Her reviews going back years invariably stated that she was a diligent employee who respected and got along with her colleagues. SOF ¶60.

Her colleagues in turn appeared to have respected her and her service to the Bank until 2014, when Santander moved the entire fraud department from Dorchester to Framingham, where she was put in the uncomfortable position of working in what amounted to a new position, a call center, taking two hundred calls a day from often disgruntled Bank customers. SOF ¶64. Her career up till that point had involved back office analysis and fixing account issues. SOF ¶52-54. In this new setting, she was cheek by jowl with other call center employees, many of whom were much younger, bilingual and did not share her work ethic or outlook. SOF ¶55. She suspected that Santander had decided to move fraud operations to Framingham in order to get rid of dead wood, i.e. older workers like herself herself who did not speak Spanish and did not fit with Santander's vision for a call center staffed by multilingual college graduates. SOF 58. Out of the forty people hired in the fraud department in 2017, the year of Sweeney's termination, thirty six were under the age of forty. SOF ¶59.

The next clue that Sweeney was not part of Santander's future was a thoroughly disorienting performance review by manger Kim Foisy in February 2015. Foisy accused Sweeney of calling ahead to have someone log into her phone to make appear that she was already at her desk. SOF ¶57. This allegation, vehemently denied by Sweeney, was simply dropped when no proof was turned up. Id. Equally disconcerting was the negative review she received "partially meets expectations" instead of her accustomed "expectations totally meant" which meant that it would be difficult for her to attempt to transfer to another department in the Bank to a position and environment that suited her better. SOF ¶56.

Sweeney soldiered until June 2017 when C.B., a 29 year old white female who had been hired in September of 2016, reported to a manager that Sweeney made her feel "uncomfortable." SOF ¶13. This demarche from C.B. then evolved into an investigation by Karen Fitch-Urbano during which nine or more people were questioned, but not a single written statement was obtained or signed by the interviewees concerning any of the allegations levelled against Sweeney bringing into question their credibility. SOF ¶13, 19. Sweeney had commented to some of her co-workers in the call center that she herself was uncomfortable when, talking amongst themselves, they switched from English into Spanish, a language Sweeney does not speak. SOF ¶17. She was also uncomfortable with this behavior because she was used to Bank employees communicating in English. SOF ¶17.

Fitch-Urbano was told by another employee, A.G., that he had overhead Sweeney say "What do all these black people do here all day? They just stand

3

around."[1] SOF ¶21. This statement was apparently uttered into thin air, because Fitch-Urbano did not identify who Sweeney allegedly uttered these comments to in the cloistered call center, where everybody could see and hear everyone else. It was also qualified by Sweeney's supervisor, Jose Claudio, who told Urbano that Sweeney was commenting on the poor performance of an employee who happened to Black. SOF ¶21. It defies belief that a thirty-three year employee with a spotless record would utter these words, and that Fitch-Urbano would believe them. But as she stated at her deposition, it was not her job to assess credibility, but simply to record what she was allegedly told. SOF ¶21. Another employee, E.A., perhaps sensing what was expected of her, allegedly told Fitch-Urbano "This kind of race makes mistakes, in reference apparently to people of color."[2] SOF ¶22. The construction of this comment makes it unbelievable on its face. Fitch-Urbano also discovered that A.G. was "fearful" of Sweeney, apparently because he thought she had some kind of "in" with human resources and could do whatever she wanted. SOF ¶25. A person as sensitive as A.G. would have presumably immediately reported such racist comments, had he actually heard them. None of these alleged comments were reported contemporaneously to management or put in writing in any way. SOF ¶25.

Based on their content and lack of authentication, a reasonable juror could infer that the allegations against Sweeney were not credible and that the results of the

---

[1] Sweeney denies making any racist comments.
[2] The vast majority of the employees interviewed denied hearing Sweeney make any comments about "black people".

4

investigation were pre-ordained to get rid of Sweeney based of her age because she did not "fit-in".  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *St. Mary's Honor Center v. Hicks*, 509 US 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant particularly if disbelief is accompanied by a suspicion of mendacity may, together with the elements of the prima facie case, suffice to show intentional discrimination."). From the incredible reasons given for Sweeney's termination, and the flawed investigation which supposedly supported it, a fact finder could infer, and must for purposes of this motion, that they were a pretext to terminate an employee with thirty-three years or service who did not "fit in" to the Bank's plans to staff up a younger, more diverse, bilingual speaking, fraud investigation unit. SOF ¶62-3.

At most, the only credible allegation against Sweeny boils down to her thinking that the employees when possible should speak English in the office, something that was once a truism, and is still probably the opinion of most older workers.

For the coup de grace, Fitch-Urbano discovered that at least a year prior, Sweeney had allegedly asked another employee if she would consider not speaking on her phone while she was trying to decompress in the tiny breakroom, seeking a few moments of quiet away from the phone banks.  SOF ¶23.  Because this employee happened to be speaking Russian on the phone, Fitch-Urbano took this as further proof that Sweeney has suddenly decided to go on a discrimination spree at the Framingham call center despite calls customarily taking place outside the break room due to its limited size and lack of privacy. Further, this event was never reported as problematic

5

until suddenly Urbano's "take no prisoners" investigation was underway.

When she had complete her investigation, Fitch-Urbano typed up some kind of findings or report and emailed to upper management and in-house counsel, but did not bother to send a copy to Daniel Hyland, the head of the fraud department, who ultimately had sole authority to make the decision to terminate Sweeney.  SOF ¶35.  Santander claims that her report is protected by the attorney-client privilege and has refused to produce it in discovery.  SOF ¶38.  All it has produced to connect the dots are Fitch-Urbano's hand-written notes, which are difficult for even her to decipher and were clearly jotted down in anticipation of a formal report, the contents of which are unknown.  SOF ¶38   Nor was Sweeney ever provided with a formal termination letter, after thirty-three years of service she was read some talking points, handed a separation document and then escorted out by security.  Ex. G, Sweeney Depo.

As to Hyland's motivations, it is seems clear the he was just a rubber stamp.  He did not receive a copy of Fitch-Urbano's investigative report, nor does it appear he was concerned enough to request it as his decision was a mere formality, namely eliminate the older none Spanish-speaking workers and replace them with younger bilingual employees. SOF ¶35.

There is therefore a genuine issue of material fact as to whether Santander's investigation, whose findings were contradicted by Sweeney's own manager and not credible to begin with, was simply a pretext to remove an employee with thirty-three years of service, and part of a larger effort which began with poor performance review and a groundless allegation of time-card fraud.

6

Plaintiff therefore requests that the motion to dismiss her ADEA claim be denied.

Plaintiff, Gail Sweeney,
By Her Attorney,

/s/ James E. Neyman
James E. Neyman (BBO 555229)
James E. Neyman & Associates, P.C.
76 Canal Street, 3d Floor
Boston MA 02114
james@neymanandassociates.com
617-723-2627

Dated: January 21, 2021

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF) on January 21, 2021.  All parties are represented by registered participants.

/s/ John R. Bita III

7

8