UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GAIL SWEENEY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. 19-cv-10845-ADB |
| SANTANDER BANK, N.A., | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Gail Sweeney ("Plaintiff") alleges that Defendant Santander Bank, N.A.,

("Defendant") violated federal and state laws when it fired her in July 2017.  Currently before

the Court are Defendant's motion for summary judgment, [ECF No. 37], and motion to strike,

[ECF No. 47].  For the reasons set forth below, the motion to strike is <u>GRANTED</u> in part and

<u>DENIED</u> in part, and the motion for summary judgment is <u>GRANTED</u>.

**I.    BACKGROUND**

**A.    Factual Background**

Except as otherwise noted, the following facts are undisputed.[1]

1.    <u>Plaintiff's Position in the Fraud Department</u>

At all times relevant to this litigation, Plaintiff worked in Defendant's Fraud Department

as a fraud analyst.  [ECF No. 39 ¶ 5; ECF No. 45 ¶ 5].  Plaintiff was supervised by her manager,

---

[1] Unless otherwise noted, the Court draws the facts from Defendant's statement of material facts, [ECF No. 39], Plaintiff's response to Defendant's statement of material facts and additional material facts, [ECF No. 45], Defendant's response to Plaintiff's statement of additional material facts, [ECF No. 49], and the documents referenced therein.

Jose Claudio, who reported to Kim Williams.  [ECF No. 39 ¶ 8; ECF No. 45 ¶ 8].  Ms. Williams reported to the Director of Fraud Operations, Daniel Hyland.  [ECF No. 39 ¶ 8; ECF No. 45 ¶ 8].

In 2014, Defendant moved its Fraud Department from Dorchester to Framingham, Massachusetts and, as a result, Plaintiff's job responsibilities changed.  [ECF No. 49 ¶ 54].  She stopped processing fraud claims and began "speaking directly with customers in a call center environment."  [Id.].  While working at the call center, Plaintiff sat at an open table, with six colleagues, where everyone could see and hear each other.  [ECF No. 39 ¶ 7; ECF No. 45 ¶ 7].

After the Fraud Department moved to Framingham, Plaintiff believes that older workers were "weeded out," [ECF No. 45 ¶ 58], that Defendant began hiring more Spanish-speaking employees, [id. ¶ 58], and that Defendant set up a new unit called the "Fraud Center of Excellence," which consisted of bilingual college graduates, [id. ¶ 62; ECF No. 46-7 ¶ 24].  Defendant disputes these assertions as unsupported by any evidence in the record.  [ECF No. 49 ¶¶ 58, 62 (Defendant's Response)].

In 2017, a majority of the newly hired employees in Defendant's Framingham fraud unit were under forty years old.[2]  [ECF No. 49 ¶ 59].

   2.   Defendant's Policies

Defendant maintained an "Anti-Discrimination & Harassment" policy, which stated that

> A workplace built on mutual respect must be free of any conduct that creates an intimidating, offensive or hostile work environment.  Santander is firmly committed to a policy against discrimination in employment and to the right of all Team Members to work in an environment free of discrimination and harassment. Discrimination against or harassment of any Team Member on the basis of his or her race, color, religion, sex, national origin, age disability, genetic information, gender identity, uniformed service or any other characteristic protected by applicable law is strictly prohibited.

---

[2] The parties dispute the exact number of hires in 2017, but it is undisputed that most of the new hires were younger than forty.

[ECF No. 39 ¶ 1; ECF No. 45 ¶ 1].  Defendant's Code of Conduct also had an "Equal

Opportunity, Respectful, and Safe Workplace" policy that said

> Santander US is committed to a safe workplace that values equal opportunity, is free from discrimination and harassment, and does not tolerate inappropriate workplace behavior.  You are expected to act professionally and show respect for others, thus fostering a positive, inclusive and productive work environment . . . .
>
> Santander US does not tolerate, and is firmly committed to preventing, harassment, abuse, intimidation, physical or verbal abuse, or any other behavior demonstrating a lack of respect toward others.  You have the responsibility to foster a respectful, inclusive, and productive work environment.  Examples of unacceptable conduct include unwelcome jokes, threats, unwanted physical contact, derogatory comments, teasing, bullying, intimidation or other offensive action whether related to an individual's membership in a protected class or not.

[ECF No. 39 ¶ 2; ECF No. 45 ¶ 2].  Plaintiff was familiar with both policies, and

Defendant generally encouraged its employees to report discrimination and harassment.

[ECF No. 39 ¶¶ 3–4; ECF No. 45 ¶¶ 3–4].

Defendant also had an Enterprise Severance Policy ("ESP"), which provided that

"[s]everance benefits are only available to Team Members subject to a workforce reduction or

position elimination and, as such, will not be provided if a Team Member is terminated for . . . .

[m]isconduct or violation of company policies, procedures, practices, or the Code of Conduct."

[ECF No. 39-2 at 26].  The ESP also explained that it was "intended to be a welfare benefit plan

as defined in Section 3(1)" of ERISA.  [Id. at 29].

### 3.    Coworker Complaints and Plaintiff's Termination

On or about June 16, 2017, Plaintiff's coworker, Corey Black, reported to Ms. Williams

that she was working in an uncomfortable environment.  [ECF No. 39 ¶ 13; ECF No. 45 ¶ 13].

Ms. Williams contacted Defendant's Senior Employee Relations Consultant, Karin

Fitch-Urbano, about the complaint.  [ECF No. 39 ¶ 14; ECF No. 45 ¶ 14].  Ms. Fitch-Urbano's

responsibilities included working with employees and management on human resources ("HR") issues and also conducting workplace investigations.  [ECF No. 39 ¶ 15; ECF No. 45 ¶ 15].

Ms. Fitch-Urbano reached out to Ms. Black to discuss the complaint.  [ECF No. 39 ¶ 16; ECF No. 45 ¶ 16].  Ms. Black told Ms. Fitch-Urbano about a June 14, 2017 incident where several employees were speaking Spanish and Plaintiff told them they needed to speak English because they were in America.  [ECF No. 39 ¶ 17; ECF No. 45 ¶ 17].  After this discussion, Ms. Fitch-Urbano began an investigation and interviewed several of Plaintiff's coworkers.  [ECF No. 39 ¶¶ 18–19; ECF No. 45 ¶¶ 18–19].  Ms. Fitch-Urbano learned that four other employees witnessed the June 14, 2017 incident and that Plaintiff had made her remarks in response to a coworker practicing Spanish with his colleagues.  [ECF No. 39 ¶ 20; ECF No. 45 ¶ 20].[3]

During the investigation, Plaintiff's coworkers told Ms. Fitch-Urbano about other incidents involving Plaintiff.  One coworker reported that Plaintiff said "[w]hat do all these black people do here all day? They just stand around."  [ECF No. 39 ¶ 21; ECF No. 39-4 at 16].  Another coworker reported that Plaintiff told her that "[t]his kind of race makes mistakes," in reference to people of color.  [ECF No. 39 ¶ 22; ECF No. 39-4 at 64].  Plaintiff denies ever making racist comments.  [ECF No. 45 ¶¶ 21–22].

Ms. Fitch-Urbano also learned about another incident where Plaintiff asked a coworker who was speaking Russian in the break room: "How long are you going to do this? I just want some peace and quiet."  [ECF No. 39 ¶ 23; ECF No. 39-4 at 35].  Plaintiff admits that she asked for peace and quiet, but states that it was motivated by her desire for quiet during her break, not

---

[3] In her response to Defendant's statement of facts, Plaintiff does not explicitly admit or deny what her coworkers told Ms. Fitch-Urbano about the June 14, 2017 incident.  Instead, she states that she was uncomfortable when her coworkers spoke Spanish around her and "thought they switched languages because they did not want her to know what they were saying."  [ECF No. 45 ¶¶ 17, 20].

her coworker's use of Russian.  [ECF No. 45 ¶ 23].  Several employees told Ms. Fitch-Urbano

they were "fearful" of Plaintiff because she said she had a friend in the HR department.  [ECF

No. 39 ¶ 24; ECF No. 45 ¶ 24].  Plaintiff does not have any connections in HR and believes that

it was unreasonable for her coworkers to be afraid of her based on this rumor.  [ECF No. 45

¶ 25; ECF No. 46-2 at 48].

Ms. Fitch-Urbano interviewed Plaintiff as part of the investigation and told Plaintiff what

had been reported.  [ECF No. 39 ¶¶ 27–28; ECF No. 45 ¶¶ 27–28].  During the interview,

Plaintiff told Ms. Fitch-Urbano that she wanted to file a complaint against those who had

complained about her conduct because she believed the accusations were false.  [ECF No. 39

¶¶ 32–33; ECF No. 45 ¶¶ 32–33; ECF No. 46-1 at 35].  Ms. Fitch-Urbano did not investigate

Plaintiff's complaint.  [ECF No. 39 ¶ 34; ECF No. 45 ¶ 34].  According to Defendant, Plaintiff's

complaint did not offer allegations beyond what was already investigated or identify any

additional witnesses.  [ECF No. 39 ¶ 34].

Following the investigation, Ms. Fitch-Urbano summarized her findings in a report that

was sent to Defendant's in-house legal department.  [ECF No. 46-2 at 47].  The final report has

not been produced to Plaintiff or the Court because Defendant asserts that it is privileged.  [ECF

No. 45 ¶¶ 35, 38; ECF No. 46-2 at 44].  Ms. Fitch-Urbano then spoke with Mr. Hyland about her

findings, and he concluded that Plaintiff's conduct, as reported by her coworkers, was contrary to

Defendant's Anti-Discrimination & Harassment and Equal Opportunity, Respectful and Safe

Workplace policies.  [ECF No. 39 ¶¶ 35–36; ECF No. 45 ¶¶ 35–36].[4]  Mr. Hyland decided to

---

[4] Plaintiff does not explicitly admit or deny that Mr. Hyland concluded the conduct was contrary
to Defendant's policies, but states that his decision was not documented in writing, which was
also required by Defendant's Code of Conduct.  [ECF No. 45 ¶ 36].  A June 23, 2017 email
outlining the agenda for Plaintiff's June 26, 2017 meeting with Mr. Hyland states that Plaintiff's

terminate Plaintiff.  [ECF No. 39 ¶¶ 35–37; ECF No. 45 ¶¶ 35–37].  Ms. Fitch-Urbano, her superiors, and Defendant's in-house counsel agreed with Mr. Hyland's determination.  [ECF No. 39 ¶ 39; ECF No. 45 ¶ 39].

Because of her long tenure with the bank, Plaintiff was offered a "mutual agreement" where Plaintiff would have a two-month, non-working period after which she would resign, and Defendant would not contest her claim for unemployment.  [ECF No. 39 ¶ 40; ECF No. 45 ¶ 40; ECF No. 39-5 at 22].  Ultimately, Plaintiff did not accept the offer for a "mutual agreement," and she was terminated on July 17, 2017.  [ECF No. 39 ¶¶ 43–44; ECF No. 45 ¶¶ 43–44].  Plaintiff was replaced by a twenty-five-year-old employee who self-identifies as white.  [ECF No. 39 ¶ 45; ECF No. 45 ¶ 45].

### 4.    Plaintiff's Prior Performance Reviews

Over the course of her employment, Plaintiff received several performance reviews.  In February 2015, Plaintiff's manager at the time, Kim Foisy, wrote that Plaintiff "partially [met] expectations," and also accused her of timecard fraud.  [ECF No. 49 ¶¶ 56–57].  According to Plaintiff, this negative review made it difficult for her to transfer to a different position.[5]  [Id. ¶ 56].  Plaintiff asserts that she felt targeted after the February 2015 review because she believed that Defendant wanted older employees to leave the bank.  [Id. ¶ 58].

Apart from the February 2015 review, Plaintiff received positive comments throughout her time at the bank, including that she: was "able to work cooperatively and effectively with other team members," "communicate[d] fairly well with her internal and external customers and

---

conduct was "a violation of basic professional standards and the Code of Conduct."  [ECF No. 39-5 at 22].

[5] Defendant disputes this and argues that Plaintiff was able to apply and interview for another job in 2017.  [Id. ¶ 56 (Defendant's Response)].

has created good relationships within [the] department," was "committed to diversity," "actively promote[d] the exchange of ideas, knowledge, experience and information with other members of the group," and was "[always] tolerant of the ideas, values and opinions of others." [ECF No. ¶ 60]. In her final review before she was terminated, Mr. Claudio rated her overall performance as "expectations totally met" and gave her an "[a]lways" rating for the following categories: "[i]s tolerant of the ideas, values and opinions of others" and "[c]learly expresses [her] opinion, though respecting that of others, and always provides constructive criticism." [Id. ¶ 61].

### B.    Procedural Background

Plaintiff originally filed her lawsuit in Middlesex County Superior Court on December 28, 2018. [ECF No. 1-1 ("Compl.")]. Defendant removed the action to this Court on April 23, 2019. [ECF No. 1]. Plaintiff's four-count complaint alleges that Defendant: (1) engaged in age discrimination in violation of the Massachusetts Fair Employment Practices Act, Mass Gen. Laws ch.151B, § 4(1B) *et seq.*, ("FEPA") (Count I), [Compl. at 5], and the federal Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*, ("ADEA") (Count II), [id. at 6]; (2) engaged in race discrimination in violation of the FEPA (Count III), [id.]; and (3) breached the ESP when it failed to pay her severance benefits (Count IV), [id. at 6–7].

On November 30, 2020, Defendant moved for summary judgment on all claims, [ECF No. 37], and Plaintiff opposed on January 21, 2021, [ECF No. 44]. In support of her opposition, Plaintiff filed her own affidavit, [ECF No. 46-7], as well as an affidavit from Mr. Claudio, [ECF No. 46-8], and her former coworker, Karen McNulty, [ECF No. 46-9]. On February 4, 2021, Defendant filed a motion to strike portions of those affidavits, [ECF No. 47], which Plaintiff opposed on February 22, 2021, [ECF No. 53].

## II.    MOTION TO STRIKE

Defendant moves to strike portions of Plaintiff's, Mr. Claudio's, and Ms. McNulty's affidavits because they contain statements that are not based on personal knowledge, are impermissible conclusions, or are based solely on opinion and belief.  [ECF No. 47 at 2–7].[6]  As described below, the motion to strike is GRANTED in part and DENIED in part.

### A.    Personal Knowledge

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out on facts that would be admissible in evidence, and show the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  However, "[t]he rule requires a scalpel, not a butcher knife. The *nisi prius* court ordinarily must apply it to each segment of an affidavit, not to the affidavit as a whole."  Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001) (citing Akin v. Q-L Invs., Inc., 959 F.2d 521, 531 (5th Cir. 1992)).  "When conducting this fine parsing of an affidavit, 'personal knowledge is the touchstone,' and such 'requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise.'"  Teragram Corp. v. MarketWatch.Com, Inc., No. 02-cv-11138, 2004 WL 3086883, at *12 (D. Mass. Dec. 29, 2004) (quoting Perez, 247 F.3d at 315–16).  "[A] 'party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."  Reynolds v. Steward St. Elizabeth's Med. Ctr. of Bos., Inc., 364 F. Supp. 3d 37, 56 (D. Mass. 2019) (quoting Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000)).

---

[6] Specifically, Defendant moves to strike the following paragraphs from Plaintiff's affidavit: ¶¶ 1, 5, 7–8, 10–13, 16, 19–20, 23–28, 30–31, 36–44, 46–47, 49–50.  Defendant moves to strike the following paragraphs from Mr. Claudio affidavit: ¶¶ 3, 5–8, 10–19.  Lastly, Defendant moves to strike the following paragraphs from Ms. McNulty affidavit: ¶¶ 4–8, 11–18, 20–26, 28.

### 1.    Mr. Claudio's Affidavit

Defendant seeks to strike the portions of Mr. Claudio's affidavit that discuss Plaintiff's termination (paragraphs 3, 12, and 14) because he has admitted that he did not have any role in the termination decision.  [ECF No. 47 at 2]; see [ECF No. 46-8 ¶ 15 ("As her direct supervisor, I would have thought that I would have been asked for input in a decision of this nature, but I was not.")].  Because Mr. Claudio did not have any role in Plaintiff's termination, he has no personal knowledge of the reason she was fired, and paragraphs 3, 12, and 14 are stricken to the extent they discuss those reasons.

Defendant also seeks to strike paragraphs 5, 6, and 7 of Mr. Claudio's affidavit because they discuss performance reviews that occurred before he managed Plaintiff.  [ECF No. 47 at 2].  While he was not her manager at the time, it is conceivable that as her supervisor he would have personal knowledge of her prior evaluations, and regardless, as explained infra, Plaintiff's prior evaluations do not create a genuine issue of material fact as to whether Defendant discriminated against her.

Finally, Defendant moves to strike paragraphs 11, 13, and 15–16, which discuss the Defendant's investigation into Plaintiff's alleged misconduct.  [ECF No. 47 at 2].  The Court strikes these paragraphs to the extent they discuss events that Mr. Claudio did not witness or speculate as to the reasoning behind the investigation.  Although Mr. Claudio was interviewed as part of the investigation, he has no foundation to testify beyond his personal involvement or the conduct he observed.

### 2.    Ms. McNulty's Affidavit

Defendant moves to strike paragraphs 8, 12–13, 16–18, 20–21, and 23 of Ms. McNulty's affidavit because she simply states that she was "advised that [Plaintiff] was terminated" and

there are no other facts to demonstrate how she would have personal knowledge of those events. [ECF No. 47 at 3].  The Court will strike the portion of paragraph 8 which indicates that Ms. McNulty was "advised that [Plaintiff] was terminated," but the remainder of this paragraph is admissible as it describes Ms. McNulty's firsthand perception of Plaintiff.  The Court also strikes paragraphs 12 and 13 which purport to describe Plaintiff's status at the company.  As a coworker, and not a supervisor, Ms. McNulty would not have personal knowledge about that issue.  Paragraphs 16–18, 20–21, and 23 are also struck to the extent they describe the conduct that led to the coworkers' complaints about Plaintiff, the investigation, or Defendant's motivation or reasoning behind the investigation.  Ms. McNulty does not offer any facts to demonstrate that she observed the complained of conduct, participated in the investigation, or observed Defendant's decision-making process.

   3. <u>Plaintiff's Affidavit</u>

  Defendant moves to strike paragraph 29 of Plaintiff's affidavit, which says: "Jose Claudio was over 50 [when he] was separated from employment after being accused of discrimination."  [ECF No. 47 at 3].  Because Plaintiff offers no other facts to demonstrate that she observed or otherwise had firsthand knowledge of the circumstances surrounding Mr. Claudio's termination, this statement is stricken to the extent it discusses his termination.

 **B.** **Conclusory Statements**

  "'[A]ffidavits may not contain arguments or conclusory assertions' that would not be admissible at trial."  <u>Fin. Res. Network, Inc. v. Brown & Brown, Inc.</u>, 867 F. Supp. 2d 153, 171 (D. Mass. 2012) (quoting <u>Murphy v. Ford Motor Co.</u>, 170 F.R.D. 82, 85 (D. Mass. 1997)). "Without any specific factual knowledge to support [a] statement, it is a mere conclusion that

cannot serve as probative evidence." Reynolds, 364 F. Supp. 3d at 57 (quoting Navedo v. Nalco Chem., Inc., 848 F. Supp. 2d 171, 179–80 (D.P.R. 2012)).

Defendant asserts that the affiants have no factual basis to support their statements about (1) the new fraud analyst group consisting of primarily college graduate, bilingual workers; (2) the demographics of the Fraud Department; (3) the languages spoken by Defendant's customers; and (4) the languages spoken by other coworkers.  [ECF No. 47 at 4].  Plaintiff, Mr. Claudio, and Ms. McNulty all worked in the Fraud Department in 2017 and their statements regarding their experiences in the department and with customers—though certainly not detailed and ultimately insufficient to defeat summary judgment—are not improper and will not be struck.

Paragraphs 36, 39, 44, and 46 of Plaintiff's affidavit also discuss the reasons that other employees were (or were not) fired, disciplined, or paid a severance.  Plaintiff has not provided any facts to explain how she would know the reasons her coworkers were or were not disciplined or terminated.  The Court therefore strikes the portions of these paragraphs that discuss those circumstances.

Defendant also moves to strike the portions of the affidavits that make legal conclusions. Legal conclusions are not permissible and must be struck.  See McGrath v. City of Somerville, No. 17-cv-10979, 2019 U.S. Dist. LEXIS 168569, at *11–12 (D. Mass Sept. 30, 2019). Accordingly, the Court strikes the portions of the affidavits listed below because they make improper legal conclusions.

- Plaintiff's Affidavit: paragraph 1 ("unlawfully terminated"); paragraph 7 ("systematically engaged in unlawful behavior"); paragraph 31 ("was totally fabricated and used as a ruse to get rid of me"); paragraph 41 (stating a document is "more prejudicial than probative"); paragraph 42 ("I did not discriminate or act in a discriminatory or racist manner toward any co workers."); and paragraph 47 ("age and race and not my conduct was the basis for my termination").

11

- Mr. Claudio's Affidavit: paragraph 12 ("the investigation [was] a pretense to her termination") and paragraphs 3, 14, 17, 18, which label actions as "discrimination" or "discriminatory."

- Ms. McNulty's Affidavit: paragraph 17 ("the investigation [was] a pretense for her termination") and paragraphs 8, 21, 24, 25, which label actions as "discrimination" or "discriminatory."

## C.    Opinion or Belief

Lastly, Defendant challenges the affidavits because several statements reflect opinion or belief.  [ECF No. 47 at 5–6].  Statements in an affidavit that are premised only upon belief do not satisfy the Rule 56(c) standard.  See Fin. Res. Network, Inc., 867 F. Supp. 2d at 171. Accordingly, the Court strikes the portions of the following paragraphs that are expressly premised on the affiant's belief or opinion and lack supporting facts.

- Plaintiff's Affidavit: paragraphs 13, 16, 23, 24, 40, 41, 43, and 46;

- Mr. Claudio's Affidavit: paragraphs 12, 17, and 19; and

- Ms. McNulty's Affidavit: paragraphs 16, 17, 22, 24, and 28.

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Legal Standard

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is

evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact the moving party must . . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6. The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the

Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

"'Even in employment discrimination cases where elusive concepts such as motive or intent are at issue,' summary judgment is appropriate if the non-moving party rests 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (quoting Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)).

**B.   Discussion**

1.   Count II: Age Discrimination under the ADEA

Defendant argues that summary judgment is proper on Count II because Plaintiff was fired due to misconduct uncovered during Ms. Fitch-Urbano's investigation, and Plaintiff has failed to put forth evidence to create a genuine dispute that Defendant's proffered reason was pretextual. [ECF No. 38 at 11–12]. Plaintiff asserts that Defendant's reason for her termination is merely pretext because the complaints from her coworkers were "incredible" and the flawed investigation was part of Defendant's scheme to replace older workers with younger, bilingual employees to grow an increasingly Spanish-speaking customer base. [ECF No. 44 at 5–7].

Under the ADEA, an employer may not "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Because Plaintiff has not alleged any "direct evidence of discriminatory animus . . . , the burden of producing evidence is allocated according to the now-familiar McDonnell Douglas framework." Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995) (first citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973); then citing Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994)).

> First, the plaintiff must make out a prima facie case of discrimination. The burden then shifts to the defendant to present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision. Finally, the burden is placed on the plaintiff to demonstrate that the non-discriminatory reason is mere pretext and that the real reason was discrimination.

Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006) (citing McDonnell Douglas, 411 U.S. at 802); Greenberg, 48 F.3d at 26.

Defendant concedes that Plaintiff can establish a prima facie case for age discrimination.[7] [ECF No. 38 at 11]. Therefore, the Court proceeds directly to the second step of the burden-shifting framework to determine if Defendant has articulated a legitimate, non-discriminatory reason for the termination.

Defendant contends that it fired Plaintiff because Ms. Fitch-Urbano's investigation revealed conduct that created a hostile work environment and violated its policies. [ECF No. 38 at 9, 12]. This conduct includes (1) the June 14, 2017 incident where four employees witnessed Plaintiff tell coworkers having a Spanish conversation "this is America, we speak English"; (2) the incident where Plaintiff asked a coworker who was speaking in Russian to stop so Plaintiff could have "peace and quiet"; (3) the comments that "[w]hat do all these black people do here all day? They just stand around," and "[t]his kind of race makes mistakes"; and (4) bullying coworkers which caused them to be fearful or terrified of her. Engaging in conduct that creates a negative impact on the workplace environment is a sufficient, legitimate, non-discriminatory reason for termination and Defendant has therefore met its burden at the second step.

---

[7] The elements of the prima facie case are: (1) Plaintiff was at least 40 years old at the time of her discharge; (2) Plaintiff was qualified for the position; (3) Plaintiff was fired; and (4) Plaintiff's "employer sought a replacement with roughly equivalent occupational qualifications, thereby demonstrating a continuing need for the same services and skills." Sanchez, 37 F.3d at 719.

a.    Pretext

The final stage of the burden-shifting framework requires Plaintiff to demonstrate that a reasonable factfinder could decide that Defendant's reason for termination is merely a pretext for a discriminatory motive.

> To satisfy this burden with respect to pretext, the plaintiff must elucidate specific facts which would enable a jury to find that the reason given by the defendant for the adverse employment action is not only a sham, but a sham intended to cover up the employer's real motive: age discrimination.  At this stage of the analysis, the focus must be on the perception of the decisionmaker, that is, whether the employer believed its stated reason to be credible.

Robinson v. Town of Marshfield, 950 F.3d 21, 25 (1st Cir. 2020) (internal quotation marks and citations omitted).  When the reason for an employee's termination is based on the outcome of an internal investigation, it does not matter if Plaintiff's or her coworkers' version of the events is true because "the issue is not whether [the employer]'s reasons to fire [Plaintiff] were real, but merely whether the decisionmakers . . . believed them to be real."  Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 674 (1st Cir. 1996); see also Ronda-Perez v. Banco Bilbao Vizcaya Argentaria--Puerto Rico, 404 F.3d 42, 45 (1st Cir. 2005) ("The question is not whether [P]laintiff's or [her] fellow employees' version is the true one, but whether [Defendant] believed what [it] had been told by those [it] interviewed.").

The First Circuit's opinion in Ronda-Perez is instructive.  Ronda-Perez, 404 F.3d at 45.  Similar to the case at hand, in Ronda-Perez, a 54-year-old bank branch manager was terminated, and his position was then filled by a 42-year-old woman.  Id. at 43.  Prior to his termination, the bank initiated an investigation after a coworker complained and alleged that the plaintiff was engaged in misconduct, namely, commenting "on the physical attributes" of customers of the bank, disclosing bankruptcy filings, "meddl[ing] with the personal lives of . . . coworker[s]," and more.  Id.  A Human Resources officer then interviewed employees, reviewed the charges with

the plaintiff, and prepared a report recommending dismissal because the "plaintiff's conduct had a negative impact on the work environment . . . and . . . he had violated the bank's policies against sexual harassment." Id. at 43–44.  Following his termination, the plaintiff filed suit, claiming the true reason for his termination was age discrimination.  The district court granted summary judgment for the employer, and the First Circuit affirmed. Id.  Key to the First Circuit's reason for affirming the district's decision to grant summary judgment was that there was no evidence that the employer knew the allegations were false, and that the investigation was launched due to an unsolicited complaint from an employee. Id. at 45, 47–48.

Likewise, in the instant case, it is undisputed that the investigation began after a coworker reached out to Ms. Fitch-Urbano and that multiple employees interviewed told Ms. Fitch-Urbano about Plaintiff's conduct in the workplace and/or that they were fearful of her.  It is also undisputed that when Plaintiff was interviewed as part of the proceeding, she admitted to asking coworkers to speak in English instead of Spanish, see [ECF No. 39-3 at 18; ECF No. 39-4 at 48; ECF No. 46-7 ¶ 33], and to not have conversations in the breakroom, although she largely denied the other complaints raised by coworkers.  These findings were presented to Mr. Hyland, who determined that this conduct violated Defendant's policies and decided to terminate Plaintiff.

Plaintiff advances several reasons as to why Defendant did not believe the results of its investigation at the time that she was terminated, but the record does not support such an inference.  Plaintiff contends that she previously had a "spotless record," so it "defies belief" that Ms. Fitch-Urbano or Mr. Hyland would believe the allegations made by her coworkers.  [ECF No. 44 at 4].  Plaintiff further argues that the complaints were unbelievable because (1) other employees, including Mr. Claudio, told Ms. Fitch-Urbano that the "[w]hat do all these black people do here all day" comment was in reference to the poor performance of an employee, who

happened to be Black, and was not racially-motivated;[8] (2) other than the complaint regarding the use of Spanish in the workplace, the other incidents were not reported at the time they occurred and only came to light during the investigation; and (3) the comment about people of color making mistakes is unbelievable on its face.  [ECF No. 44 at 3–5].

As to the comment about "what do they do all day," Mr. Hyland testified in his deposition that it did not matter if it was said to specific employees with poor performance because he still found the statement racist.  [ECF No. 50-2 at 8].  Thus, other employees' opinions that the statement was not racist do not suggest that Mr. Hyland did not believe the comment was inappropriate when he made the decision to terminate Plaintiff.  Plaintiff also appears to argue that Ms. Fitch-Urbano did not actually find this particular complaint credible, because, when asked during her deposition if she believed it, she responded that "[i]t's not for me to believe, sir.  I wasn't there to overhear it; it was something that was brought forward to me."  [ECF No. 46-2 at 6].  This statement by Ms. Fitch-Urbano is not evidence that Mr. Hyland, the individual who made the decision to terminate Plaintiff, did not find the complaint credible, or that it was not otherwise corroborated by other evidence discovered during Ms. Fitch-Urbano's investigation.

Second, the fact that Ms. Fitch-Urbano uncovered additional, previously unreported complaints about Plaintiff does not support the inference that Ms. Fitch-Urbano or Mr. Hyland did not find the allegations credible, especially when the investigation also found that coworkers were afraid of Plaintiff.  Finally, Plaintiff's conclusory statement that the "mistakes" comment is unbelievable on its face is not evidence that Ms. Fitch-Urbano or Mr. Hyland did not believe that

---

[8] Plaintiff's position on this point is inconsistent.  She appears to deny making this statement, while at the same time arguing that it was not racially motivated.  [ECF No. 44 at 4].

Plaintiff violated its policies.  Plaintiff's unsupported denials are not sufficient to create a trible

issue of fact.  Ronda-Perez, 404 F.3d at 45 ("Plaintiff's plea that his denials establish triable

issues of fact foreclosing summary judgment would, if accepted, spell the end of summary

judgment.").

    Plaintiff also contends that Mr. Hyland, though he was the sole decisionmaker, was

merely a "rubber stamp" who approved the termination without ever reading the report that

Ms. Fitch-Urbano sent to the legal department.  [ECF No. 44 at 6].  The record, however,

demonstrates that Mr. Hyland was informed about the results of the investigation, even if he did

not read the formal report.  He testified that Ms. Fitch-Urbano "walked [him] through the results

of the investigation, [they] looked at all those results together and the decision was made to

move forward with the termination based on those results."  [ECF No. 39-5 at 11].  Thus, the fact

that Mr. Hyland did not read the formal report does not establish that he did not believe the

results of the investigation or that he had any indication that Ms. Fitch-Urbano's investigation

was a sham.

    Plaintiff's other arguments attack how the investigation was conducted, including that the

investigation was merely a collection of "hand-written notes, which are difficult for even

[Ms. Fitch-Urbano] to decipher," and that witnesses were not asked to sign any written

statements, [ECF No. 44 at 3–6].  Plaintiff has not argued that Ms. Fitch-Urbano made up any of

the complaints or witnesses (nor is there any evidence in the record to suggest that occurred).

Though written and signed statements from witnesses and more formal notetaking may be

preferred, these two procedural issues are not relevant to whether Ms. Fitch-Urbano or

Mr. Hyland believed that Plaintiff violated workplace policies and should be terminated on that

basis.

b.      Discriminatory Intent

Even if Plaintiff were to succeed in showing that Defendant's reason for her termination was pretextual, this is not enough to defeat summary judgment on her ADEA claim.  Plaintiff must still demonstrate that the pretextual reason was intended to cover up the employer's true discriminatory intent.  Quinones, 436 F.3d at 289.

Plaintiff appears to argue that the demographics of the Fraud Department and Defendant's hiring practices are evidence of its alleged plan to create a younger, bilingual workforce and its age-based animus.  [ECF No. 44 at 2].  Plaintiff points to the fact that in 2017, the year she was terminated, most of the Fraud Department's new hires were under forty.  [Id.]; see [ECF No. 46-4 (Exh. D, 2017 New Hires) (confirming majority of new hires were under forty)].  Although not referenced in her briefing, Plaintiff also submitted two affidavits from other coworkers who were over fifty years old when they were fired.  [ECF Nos. 46-8, 46-9].  Statistical evidence of hiring and firing practices "rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee . . . . because a company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir. 1993).  Further, Plaintiff must also present sufficient information about the labor market to allow the Court to contextualize the statistics she presents.  Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 146 (1st Cir. 2012) ("[O]ur case law makes clear that [plaintiff] should have introduced evidence regarding the relevant labor market in order to put [defendant's] hiring data into context.").  Although Plaintiff has presented statistics about Defendant's 2017 hiring practices, she has not explained anything about the pool of applicants.  See LeBlanc, 6 F.3d at 848 (finding flaw in statistical

evidence that did not provide information about pool of applicants).  On the other hand, Mr. Hyland testified that the applicant pool for the Fraud Department skews younger due to the entry-level roles available.  [ECF No. 39-5 at 12–14].  Thus, Plaintiff's statistics are not sufficient to raise a question of material fact regarding Defendant's true reason for terminating Plaintiff.

Plaintiff also asks the Court to draw the inference that Defendant moved its Fraud Department to Framingham in 2014 in an effort to get rid of older workers who did not speak Spanish.  [ECF No. 44 at 2].  Plaintiff admits that her only support for this proposition is her own suspicion.  [Id. at 2 ("[Plaintiff] suspected that [Defendant] had decided to move fraud operations to Framingham in order to get rid of dead wood, i.e. older workers . . . .")].  This conclusory assertion about Defendant's motivations, which has no other support in the record, is insufficient to create a dispute of fact.  Similarly, Plaintiff's and Mr. Claudio's statements regarding the Fraud Center of Excellence are not sufficient to create an issue of fact regarding discriminatory intent.  The group's existence and the fact that it was made up of college-aged graduates, without more, does not give rise to the inference that Plaintiff was terminated because of her age.

Finally, Plaintiff also raises her unfavorable 2015 performance review and the allegation of timecard fraud as evidence of discrimination.  [ECF No. 44 at 3].  Plaintiff does not explain how this review, which took place more than two years before her termination and under the supervision of a different manager, demonstrates discriminatory intent.  Plaintiff has not alleged any evidence to suggest that this review was fueled by age-based animus, except that it occurred after the move to Framingham, which the Court has already determined is not evidence of age discrimination.  It is also undisputed that, after this review, Plaintiff was able to transfer to a new manager, Mr. Claudio, who gave her favorable reviews.

Accordingly, Defendant's motion for summary judgment on Count II is <u>GRANTED</u>.

      2.    <u>Count I: Age Discrimination under the FEPA</u>

Plaintiff's opposition discusses only her ADEA claim and does not explicitly oppose summary judgment on any of her other claims. [ECF No. 44 at 7 (Plaintiff's opposition requesting only that "the motion to dismiss her ADEA claim be denied")]. Therefore, it appears that Plaintiff has abandoned her age discrimination claim under the FEPA. <u>Montany v. Univ. of New England</u>, 858 F.3d 34, 41 (1st Cir. 2017) (agreeing that plaintiff's "failure to put forth any argument in her opposition to defendants' motion for summary judgment . . . constitutes abandonment of any such claim"); <u>Kibbe v. Potter</u>, 196 F. Supp. 2d 48, 76 (D. Mass. 2002) (finding claim abandoned when party failed to mention it in his opposition brief); <u>Dressler v. Cmty. Serv. Commc'ns, Inc.</u>, 275 F. Supp. 2d 17, 26 (D. Me. 2003) (treating retaliation claim as abandoned when plaintiff failed to put forth any argument). This alone is sufficient to grant summary judgment in Defendant's favor.

Even assuming Plaintiff did not abandon her FEPA claim, the Court's finding on her ADEA claim also requires summary judgment on that claim. Under the FEPA, it is unlawful for an employer to terminate an employee "because of the age of . . . [the] individual." Mass. Gen. Laws. ch. 151B, § 4. "The standards applied for age discrimination claims under federal law and Massachusetts state law are so similar that those claims can be analyzed together." <u>Connolly v. Shaw's Supermarkets, Inc.</u>, 355 F. Supp. 3d 9, 15 (D. Mass. 2018) (citing <u>Tombeno v. FedEx Corp. Servs., Inc.</u>, 284 F. Supp. 3d 80, 86 (D. Mass. 2018)).[9] As explained above, Plaintiff has

---

[9] The Court notes that the analysis under the FEPA differs in at least one respect from the analysis under the ADEA, however, because "'Massachusetts is a pretext only jurisdiction,' . . . so a plaintiff . . . 'need only present evidence from which a reasonable jury could infer that "the [employer's] facially proper reasons given for its action against [the plaintiff] were not the real

failed to put forth any evidence that would allow a reasonable jury to find that the reason for her

termination was pretextual.  This is also fatal to her FEPA claim, and Defendant's motion for

summary judgment on Count I is <u>GRANTED</u>.

        3.     <u>Count III:  Race Discrimination under the FEPA</u>

Defendant moves for summary judgment on Count III because Plaintiff cannot establish a

prima facie case for race discrimination or that Defendant's reason for her termination was

pretextual.  [ECF No. 38 at 7–11].  Plaintiff also does not defend Count III in her opposition

brief and appears to abandon this claim as well.  Summary judgment in Defendant's favor is

warranted for that reason alone.  Nevertheless, even assuming that Plaintiff is continuing to

pursue this claim and taking the evidence in the light most favorable to her, no reasonable jury

could find in Plaintiff's favor.

Under the FEPA, it is unlawful for an employer to discharge an employee because of

race.  Mass. Gen. Laws ch. 151B, § 4(1).[10]  The <u>McDonell Douglas</u> burden-shifting framework

also applies to Plaintiff's race discrimination claim under the FEPA.  <u>See</u> <u>Henry v. Sterling

Collision Centers, Inc.</u>, 252 F. Supp. 3d 42, 48 (D. Mass. 2017) (citing <u>McDonnell Douglas

Corp.</u> 411 U.S. at 802)).  Even assuming Plaintiff, who does not identify as a racial minority, can

establish a prima facie case, this claim still fails because, as described in Section III.B.1 <u>supra</u>,

---

reasons for that action.'"" <u>Brader v. Biogen Inc.</u>, 983 F.3d 39, 59 (1st Cir. 2020) (quoting
<u>Bulwer v. Mount Auburn Hosp.</u>, 473 Mass. 672, 681–82 (2016)).  Ultimately, this difference
does not alter the Court's outcome on the FEPA claim.

[10] In the Complaint, Plaintiff alleges that Defendant engaged in race discrimination in violation
of Mass. Gen. Laws ch. 151B, §§ 4(2) and 2.  [Compl. at 6].  Section 4(2) prohibits
discrimination by labor organizations, and § 2 states a special commission will make policy
recommendations relating to Chapter 151B.  Neither provision applies to this case, and the Court
assumes that Plaintiff intended to bring a claim under § 4(1), which prohibits discharge from
employment due to race.  Mass. Gen. Laws ch. 151B, § 4(1).

Plaintiff has not offered any evidence to show that Defendant's reason for terminating her was pretextual,[11] or put forth sufficient evidence to doubt the legitimacy of the investigation into her conduct or that Defendant did not find the results of that investigation credible when it terminated her.  Therefore, Defendant's motion for summary judgment on Count III is GRANTED.

> ### 4.    Count IV: Breach of Contract for Denied Severance Pay

Defendant moves for summary judgment on Count IV for two reasons: (1) Plaintiff's breach of conduct claim is preempted by the Employee Retirement Income Security Act ("ERISA"); and (2) Plaintiff is ineligible for severance benefits because she was fired for misconduct.  [ECF No. 38 at 13–15].  Like Counts I and III, Plaintiff has not defended this claim in her opposition brief and appears to have abandoned it.  Assuming Plaintiff means to maintain this cause of action, as discussed below, no reasonable jury could find in her favor and summary judgment is proper.

ERISA is intended to supersede "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  29 U.S.C. § 1144.  A state law claim is preempted by ERISA if the plan at issue is an employee benefit plan, and the claim "relates to"

---

[11] Defendant argues that the Court should apply the "background circumstances" test that several other circuits have adopted in cases where a white plaintiff asserts a race discrimination claim. [ECF No. 38 at 7–8].  Under that test, in "cases of reverse discrimination . . . . a plaintiff must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something fishy about the facts at hand."  Phelan v. City of Chicago, 347 F.3d 679, 684 (7th Cir. 2003) (internal quotation marks omitted).  Because the Court finds that summary judgment on Count III is warranted for other reasons, it need not decide whether Massachusetts courts would apply the "background circumstances" test when analyzing a Chapter 151B claim asserted by a white plaintiff.

the plan.  Hampers v. W.R. Grace & Co., Inc., 202 F.3d 44, 49 (1st Cir. 2000).  While the facts

suggest that the ESP is an ERISA plan, the Court need not decide that issue because, even if the

claim were not preempted by ERISA, Plaintiff would not be eligible for severance benefits under

the plain language of the ESP.  It is undisputed that the ESP provides that these benefits are only

available to employees who were terminated as a result of a workforce reduction or position

elimination.  [ECF No. 39 ¶ 48].  Plaintiff was fired for misconduct and is thus ineligible for

benefits.

Therefore, Defendant's motion for summary judgement on Count IV is GRANTED.

## IV.   CONCLUSION

Accordingly, Defendant's motion to strike portions of the affidavits, [ECF No. 47], is

GRANTED in part and DENIED in part, and Defendant's motion for summary judgment, [ECF

No. 37], is GRANTED.

**SO ORDERED.**

September 16, 2021                                        /s/ Allison D. Burroughs

                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE